**STATE ex MOORE etc. et., Plaintiffs v. BOARD OF EDUCATION OF EUCLID CITY SCHOOL DISTRICT, Defendant**

Ohio Appeals, Eighth District, Cuyahoga County

No. 19483.  Decided March 20, 1944

Squire, Sanders & Dempsey, Cleveland, for plaintiffs.
Paul H. Torbet, Cleveland, for defendant.

162

## OPINION

By LIEGHLEY, J.

Writ denied and petition dismissed for the reason that the relators have failed to establish a clear right to the relief prayed for.

The State of Ohio has undertaken the exclusive responsibility of furnishing school service and facilities to all residents of the State of school age by means of uniform taxation. The State, in the performance of this function, has delegated broad powers to boards of Education of School Districts of all the classes named and defined in a duly enacted School Code.

An examination of this School Code will reflect a real endeavor and purpose of imposing the cost of school service of each pupil upon the District where his residence really is. **Section 4838-2 GC** (formerly §7681 GC) is an example While this Section does not expressly enumerate or include such a project as is involved herein, it is a pronouncement of the policy of the State to giude the Boards of Education of the State.

The Federal Government is without authority to colonize a portion of the territory within a School District for the duration (which we must assume) in furtherance of the war effort and then the government and the residents of this project, or either, expect to compel free school service or school service for contribution in amount much less than the cost to others.

The Board is not obligated to furnish school service to residents of this project, known as "Lake Shore Village" except such as were residents of Euclid prior to the establishment of this "Village." School service should be furnished upon receipt of tuition for them in an amount comparable to the cost of such service to other resident pupils, measured by the standard of uniform taxation, as fixed by Ohio Laws for all residents.

MORGAN, P. J. and SKEEL, J. concur in the judgment.

## CONCURRING OPINION

By MORGAN, P. J.

The Relators as parents and next friends of their minor children brought this action in mandamus in this court against the Board of Education of the Euclid City School District and its members, to compel the defendants to enroll the said minor children and all other school children similarly situated as pupils in the schools of said school district without the payment of tuition.

This matter is now before us on plaintiffs demurrer to defendants answer.

The pleadings disclose that the Relators are residents of a defense·housing project within the boundaries of the City of Euclid, owned by the United States Government, commonly known as "Lake Shore Village" and the said minor children are of school age. The boundaries of the City of Euclid and of the Euclid School District are coterminous.

On August 9, 1943, the Board of Education of the Euclid School District adopted unanimously the following resolution:

"Whereas, by reason of a change in the so-called Lanham Act, a previous contract entered into for the payment of monies in lieu of taxes on the Federal Housing Project in the City of Euclid has been superseded and a formula adopted ostensibly conforming to statutory procedure in such determination, and,

Whereas, the regional authority of FPHA denies the jurisdiction of the Auditor of Cuyahoga County, to make such determination as provided by law, and,

Whereas, it would be manifestly unfair to the citizens of Euclid and contrary to law to render usual school services without receiving tax monies comparable in amount to that which would be levied were said housing project constructed by private enterprise,

Now Therefore, Be It Resolved, that no school service be rendered to the occupants of the FPHA Project on Babbitt Road, known as Lake Shore Village unless the established rate of tuition be paid."

On September 7, 1943, the Relators presented their children for enrollment in the Euclid City School District and they were refused admission inasmuch as nothing had been paid for their education by way of tuition, or otherwise.

It is the claim of Relators that this action of the Board of Education of the Euclid City School District was in violation of the provisions of the General Code of Ohio providing for the education of all children of school age and also in violation

of the Fourteenth Amendment of the Constitution of the United States and the Constitution of the State of Ohio.

The question for decision in this case is the following: Is a Board of Education in this State obliged to enroll in its schools, minor children living with their parents in Housing Projects owned by the United States Government, within the School District, constructed under the provisions of the Lanham Act, without the payment of taxes, tuition or any other sums in lieu thereof?

The Lake Shore Village Project in which Relators reside was constructed by the Federal Public Housing Authority (usually known as FPHA) from funds appropriated by Congress under an Act of Congress commonly known as the "Lanham Act" approved October 14, 1940 (F. C. Title 42, Sec. 1521 et seq.).

Section 1521 of the Lanham Act provides that where an acute shortage of housing "exists or impends which would impede national defense activites" the administrator of the act is authorized to acquire and to improve lands for housing. Subsection (b) provides that the administrator may acquire and improve such lands and construct houses "without regard * * * to * * * federal, state or municipal laws, ordinances, rules or regulations, relating to plans and specifications or forms of contract * * * * *."

Under Section 1522 of the Lanham Act it is provided that "the housing is erected for persons engaged in national defense activities." Such persons, by the act, include "(1) enlisted men in the naval or military services of the United States; (2) employees of the United States in the Navy and War Departments assigned to duty at naval or military reservations, posts or bases; (3) workers engaged or to be engaged in industries, connected with and essential to the national defense; (4) officers of the Army and Marine Corps * * * *."

Section 1546 of the Lanham Act provides: "The administrator shall pay from rentals annual sums in lieu of taxes to any state and/or political subdivision thereof, with respect to any real property acquired and held by him under this Act (S-1521 et seq of this title) including improvements thereon. The amount so paid for any year upon such property shall approximate the taxes, which would be paid to the State and/or subdivision, as the case may be, upon such property if it were not exempt from taxation, with such allowance as may be considered by him to be appropriate for expenditure by the Government for streets, utilities or other public services to serve such property. * * * *."

Defendants' answer sets forth and the plaintiffs, by demurrer admit, that in accordance with the "Lanham Act" the

President of the United States found an acute shortage in housing existed in the City of Euclid which would impede national defense activities, and land was acquired in Euclid by the United States by condemnation proceedings brought in the United States District Court for the purpose of building defense houses thereon.

On February 24, 1942, the President of the United States by Executive Order created the Federal Public Housing Authority and pursuant to such authority, FPHA constructed needful buildings for residential purposes on the land so acquired which is situated wholly within the boundaries of the Euclid City School District.

FPHA leased the said premises to the Cleveland Metropolitan Housing Authority, a corporation created and existing by virtue of the Housing Laws of the State of Ohio, which in turn leased houses to the relators. The title to the property remains in the United States and it accordingly is not taxable by the State.

In 1942 FPHA completed the construction of 500 housing units under the provisions of the Lanham Act in the City of Euclid, which are known as "Euclid Homes." For the school year 1942-1943 the defendant Board of Education of Eucild provided school services for approximately 350 children living in this project. The Board believed and relied that payment would be made for these services by the administrator of FPHA as provided in Sec. 1546 of the Lanham Act.

The Auditor of Cuyahoga County made a valuation of the land and buildings included in said project as if for tax purposes and determined the value to be $1,340,550.00. FPHA, however, did not accept this valuation, but as stated in the answer, "arbitrarily placed a fictitious valuation on said property of $874,680.00." The result was that the Board of Education received nothing from FPHA, or from any other source last school year, for the education of 350 children living in "Euclid Homes."

FPHA later condemned other lands in the City of Euclid on which it has constructed houses known as the "Lake Shore Village Project" in which the Relators are residents.

Defendants answer further alleges that FPHA notified the defendant Board of Education that it would make its own valuation of the Lake Shore Village Project as in the case of the Euclid Homes Project; that the Auditor of Cuyahoga County is in the process of fixing a valuation as if for tax purposes on the Lake Shore Village Project but "FPHA has notified the Board of Education it will not abide by such valuation." The

Board of Education then passed the Resolution of August 9, 1943, as given above.

Attached to the answer and made a part of it is "Appendix B" which shows that the per pupil cost for education in the Euclid Schools for the school year 1941-1942 was $181.42 on the basis of an average of one child of school age per dwelling unit, which is a fair average, the proposed payment by FPHA for the education of the children living in the project is $17.36 for for each child, or 9.3% of the cost of education per pupil.

Relators contend, and with this position we agree, that this court has no jurisdiction in this case to determine what is a fair valuation for the land and buildings in the Euclid Homes or the Lake Shore Village projects, or what amount should be paid to the Board by FPHA under the Lanham Act.

Section 1547 of the Lanham Act provides that "the acquisition by the administrator of any real property pursuant to this act, shall not deprive any state or political subdivision thereof of its civil and criminal jurisdiction in and over such property, or impair the civil rights under the state or local law of the inhabitants of such property."

It is clear that Section 1547 of the Lanham Act does not cede complete and exclusive jurisdiction over real estate acquired under the Act and over its inhabitants, to the State or any of its political subdivisions.

The answer states, and by the demurrer it is admitted that:

"At all times subsequent to the acquisition of title, the United States of America, through the Administrator of the FPHA and his agents, has exercised exclusive jurisdiction over the property and premises herein described; that construction permits were not obtained under the ordinances of the City of Euclid; that the provisions of the Building Code, requiring certain standards in construction, were violated, and disregarded; that regulations and provisions of the zoning ordinances of the City of Euclid were disregarded and that at all times signs were and are maintained on the premises advising and warning that it is the property of the United States Government."

There have been a number of cases where municipalities have attempted to restrain FPHA and other agencies of the federal government from constructing houses in violation of building, zoning and health Codes. In these cases FPHA or a similar governmental authority has filed suits in the Federal Courts and has obtained injunctions against such interference. The decisions are unanimous in holding that local officials will

be restrained from enforcing state and local laws concerning the occupation and use of such property.

See: City of Alexandria v Brody, Dist. Ct. of U.S. Eastern Div. of Va. U. S. of America. vs. City of Chester, Dist. Ct. of U. S. Eastern Dist. of Penna. No 3177, * * * U. S. of America v Certain Parcels of Land in the City of Marion, Ohio, District Ct. of U. S. Northern Dist. of Ohio, No. 4912; Oklahoma City v Sanders, 94 Fed. (2d) 323.

It should be beyond dispute that Congress has no right to determine who shall and who shall not be entitled to free eduction in the public schools of Ohio. The encroachment of federal power on the rights of states and local governments has gone far in this country but it has not gone so far as that. The states still have and exercise control of their public schools which includes the right to determine who shall be entitled to enroll in the schools and to receive free education.

The legislature of Ohio finds its power to provide for a public school system in **Art. VI, Sec. 1** of the **Ohio Constitution.**

"Provision shall be made by law for the organization, administration and control of the public school system of the state supported by public funds."

The state legislature, pursuant to this authority, has enacted §4836 GC which provides that "each city, exempted village or local board of education shall have the management and control of all of the public schols of whatever name or character in its respective district."

**Section 4836-1** provides: "The Board of Education of each city, exempted village and local school district shall provide for the free education of the youth of school age within the district under its control at such places as will be most convenient for the attendance of the largest number thereof * * * *."

Thus, it becomes pertinent to inquire and to determine whether the Lake Shore Village Project where relators reside, is "within the district under its control" i.e. within the Euclid City School District and under the control of its Board of Education.

If the Board of Education should decide that a school building should be erected in the housing project would it have the right to erect such a building without first securing the consent and approval of the FPHA? If such consent and approval should be obtained, would the board have the right to determine the location, plan, size and equipment of the school building, contrary to the wishes of FPHA and without first securing its approval? If the Board of Education should decide after the construction of such a school building to aban-

don its use for school purposes and to dispose of it in the manner provided by law, could this be done without again securing the consent and approval of FPHA?

As the Lanham Act has been passed so recently the above questions, to our knowledge, have never been decided. It is our opinion that they would all be answered in the negative inasmuch as the United States is the owner of the land and there is no way by which the Euclid City School District can compel the United States to sell or lease any portion of its land. However, it is only on condition that these questions would receive an affirmative answer, can it be said that the Lake Shore Village Project is under the control of the Euclid Board of Education for all school purposes.

Certainly the Board of Education cannot be said to exercise "control" of a district where it has not the right to locate and erect a school building.

**Section 4838-2** provides: "The schools of each city, exempted village or local school district, shall be free to all school residents between six and twenty-one years of age * * * *. School residents shall be all youths who are children or wards of actual residents of the school district."

Are relators residents of the Euclid City School District? The answer to this question depends upon what governmental authority has jurisdiction over the housing project in which they reside. Clause 17 of Section 8 of Article I of the Constitution of the United States grants authority to Congress to acquire lands, as follows:

Article I, Sec. 8: "The Congress shall have power * * *: clause 17: To exercise exclusive legislation in all cases whatsoever, over such district (not exceeding ten miles square) as may be, by cession of particular states and the acceptance of congress, become the Seat of Government of the United States, and to exercise like authority over all places purchased by the consent of the legislature of the state in which the same shall be for the erection of forts, magazines, arsenals, dock-yards and other needful buildings."

The first part of clause 17 authorizes the Congress to acquire a "Seat of Government of the United States." When so acquired, Congress is "to exercise exclusive legislation in all cases whosoever in such District." Clearly Congress does not share jurisdiction with any state over the "seat of government" now known as the District of Columbia. Clause 17 further authorizes Congress to "exercise like authority over all places purchased by the consent of the legislature of the state * * * *."

That the United States Government acquired title to the lands in this housing project with the consent of the legislature of Ohio, cannot be questioned because at the time of acquisition §§13770 and 13771 GC provided:

"**Section 13770:** That the consent of the State of Ohio is hereby given, in accordance with the seventeenth clause, eighth section of the first article of the constitution of the United States, to the acquisition by the United States, by purchase, condemnation or otherwise, of any land in this state required for sites for custom houses, court houses, post offices, arsenals, or other public buildings whatever, or for any other purposes of the government."

"Section 13771: * * That exclusive jurisdiction in and over any land so acquired by the United States shall be and the same is hereby ceded to the United States, for all purposes except the service upon such sites of all civil and criminal processes of the courts of this state; but the jurisdiction so ceded shall continue no longer than the said United States shall own such lands."

It therefore seems to be beyond dispute that by force and effect of Article I, Section 8, Clause 17 of the Constitution of the United States and of sections §§13770 and 13771 GC, the United States acquired exclusive jurisdiction over the Euclid Homes and Lake Shore Village projects.

The relators, however, assert that by reason of an enactment of Congress (33 U.S.C. 733; 40 U.S.C. 255; 54 Stat. 19 and 1083 [1940]) the United States does not have exclusive jurisdiction over these projects by reason of the fact that a notice of the acceptance of exclusive jurisdiction by the United States has never been filed with the Governor of Ohio.

Said Act provides that when the United States does not desire to obtain exclusive jurisdiction of lands "the head or other authorized officer of any department or independent establishment or agency of the government may, in such cases, and at such times as he may deem desirable, accept or secure from the state in which any lands or interests therein under his immediate jurisdiction, custody or control, are situated, consent to or cession of such jurisdiction, exclusive or partial not theretofore obtained, over any such lands or interests as he may deem desirable and indicate acceptance of such jurisdiction on behalf of the United States by filing a notice of such acceptance with the governor of such state or in such other manner as may be prescribed by the laws of the state where such lands are situated. Unless and until the United States

has accepted jurisdiction over lands hereafter to be acquired as aforesaid, it shall be conclusively presumed that no such jurisdiction has been accepted."

The above enactment is not part of the Lanham Act and it has no application to the situation in this case.

The above act of Congress refers to a situation in which a "head or other authorized officer of a governmental department" might "accept or secure from the state * * * * consent to or cession of such jurisdiction exclusive or partial not theretofore obtained over any such lands or interests as he may deem desirable."

The only "consent or cession" obtained from the state of Ohio in the condemnation of these lands is set forth in §13770 GC (supra). §13771 GC immediately following, as stated above, cedes "exclusive jurisdiction" over lands so acquired by the United States "to the United States for all purposes except the service upon such sites of all civil and criminal process of the courts of this state."

No agreement was entered into with the State of Ohio by which the United States acquired only partial jurisdiction of the lands included in these housing projects. It therefore follows that the United States has acquired and retains exclusive jurisdiction over these projects.

The first use provided in the Lanham Act for the buildings to be constructed, is for "enlisted men in the naval or military service of the United States" (see §1522 supra). Accordingly, the situation in this case is no different from what it would be if the buildings in the project were now occupied by a regiment of soldiers instead of workers in defense industries.

If the buildings were occupied by soldiers, it would clearly appear that they are part of a governmental reservation. The projects are no less a government reservation because the United States Government has elected not to house soldiers in the buildings but to lease them to workers in defense industries.

The President of the United States on September 19, 1936, appointed an "Advisory Committee on Education." In 1939, this committee made a report on education in Government Reservations and Foreign Stations. We quote from the report:

"Where a reservation is under the exclusive jurisdiction of the federal government, the state has no responsibility whatever for public service including public education. Such a reservation is governmentally apart from the state. The relationship of the State to such areas was clearly stated by the

Supreme Court of Massachusetts in 1841 in an opinion on several questions, as follows: (42 Mass. 580).

"Persons who reside on lands purchased by or ceded to the United States for navy yards, forts and arsenals, and where there is no other reservation of jurisdiction to the State than that of a right to serve civil and criminal process on such lands, are not entitled to the benefits of the common schools for their children in the towns in which the lands are situated— nor are they liable to be assessed for their polls and estates to state, county and town taxes, in such towns—nor do they gain a settlement in such towns for themselves or their children, by residence for any length of time on such lands—nor do they acquire, by residing on such lands, any elective franchise as inhabitants of such towns."

The above Massachusetts case is squarely in point in this case. It has not been overruled and it is important that in 1939 an "Advisory Committee on Education" appointed by the President of the United States, considered it to be good law.
The report continues:

"However, it is clear that, in accordance with the idea that the general welfare will suffer if children are not educated and the American principle that each child has a right to a free education, definite obligation rests upon the Federal Government for the education of children residing on these reservations which are under exclusive Federal jurisdiction. By some means or other the Federal Government should recognize its responsibility for the free education of these children and make provision for discharging it."

The jurisdiction exercised by the United States Government over this project is no different from what its jurisdiction would be if the land had been acquired for a fort or an arsenal instead of for defense housing inasmuch as the acquisition of land for forts and arsenals and for "other needful buildings" is provided for in the same provision of the United States Constitution (Art. I, Sec. 8, Clause 17).
That the Board of Education is under no obligation to admit children living in these housing projects to the public schools without the payment of tuition, is in accord with the opinion of the Comptroller General of the United States (see opinion No. B-26073 June 19, 1942). In reply to a letter from the Housing Administrator requesting an opinion regarding

the payment of sums approximating taxes on Lanham Act projects, the United States Comptroller General replied:

"There appears no authority to make any payment for any period prior to January 21, 1942, to local taxing agencies which did not enter into agreements as required by the original Section 9 and which presumably were not obligated to furnish the services for which such payments were to be made."

Relators have cited cases which hold that residents of government housing projects are entitled to vote in elections held in the subdivisions in which the housing project is located.

Johnson v Morrow, etc., 28 Cal. (2d) 446; 126 Pac. (2d) 873; State ex Farker v Corcoran, 155 Kan. 714; 128 Pac. (2d) 999.

The above cases involved statutes of states other than Ohio and on a different subject. We are not called upon to express an opinion and we express none on the question whether the residents of the Lake Shore Village Project are entitled to vote at elections.

In the case of **Sinks vs. Reese, 19 Oh St 308,** the Supreme Court of this State held that inmates of a National Asylum for disabled soldiers were not residents of Ohio and accordingly were not entitled to vote "at any election held within and under the laws of the State." The court held that the National Asylum was a "needful building" for the erection of which the United States might purchase and hold territory under Art. I, Section 8 of the Constitution of the United States. The court also held: (2nd syllabus)

"When territory for such purpose is so purchased by 'the consent of the legislature of the state in which the same shall be' the government of the United States is invested, under the provisions of the same section, with exclusive jurisdiction over the same and its appurtenances in all cases whatsoever."

Later, there was enacted a law by Congress to the effect "that the jurisdiction over the places purchased for the erection of the 'national asylum for disabled volunteer soliders' and upon which said asylum is located is hereby ceded to the State of Ohio and relinquished by the United States."

In **Renner vs Bennett, 21 Oh St 432,** the court held that the Act of Congress relinquishing its jurisdiction over the land occupied by the National Asylum and re-ceding it to the State of Ohio was effectual for that purpose and that the inmates who had established their residence at the asylum were entitled to vote at later state and local elections.

In the instant case Congress has passed no act relinquishing or re-ceding its jurisdiction over these housing projects and for the reasons already stated, Section 307 of the Lanham Act (Title 42, Sec. 1547) is not a relinquishment or a re-ceding to the state of the jurisdiction of the United States.

That the Lanham Act does not relinquish or re-cede the jurisdiction of the United States over housing projects constructed under it, is shown conclusively by a comparison of the pertinent provision in the Lanham Act (Title 42, Sec. 1547) with a similar provision in a previous Housing Act. On June 29, 1936, an Act of Congress was approved relating to slum clearance and low cost housing projects 49 Stat. L. 2025-2035-6) which provided that:

"The acquisition by the United States of any real property heretofore or hereafter acquired in connection with any low-cost housing or slum clearance project * * * * shall not be held to deprive any state or political subdivision thereof of its civil and criminal jurisdiction in and over such property or to impair the civil rights under the local law of the tenants or inhabitants on such property: **and insofar as any such jurisdiction has been taken away from any such state or subdivision, or any such rights have been impaired, jurisdiction over any such property is hereby ceded back to such state or subdivvision."**

When the Congress passed the Lanham Act, it used almost verbatim the langauge in the above act to the effect that the acquisition of property by the United States should not be held to deprive any state or political subdivision thereof of its civil or criminal jurisdiction or to impair the civil rights of the inhabitants on such property, but the Lanham Act omits entirely the concluding sentence of the above Act, which provides:

"Insofar as any such juridiction has been taken away from any such state or subdivision or any such rights have been impaired, jurisdiction over any such property is hereby ceded back to such state or subdivision."

Of course, the omission of the above sentence from the Lanham Act ceding back the jurisdiction of the United States in acquired property to the State, was no accident. Clearer proof cannot be imagined that Congress thereby intended to retain in its entirety the exclusive jurisdiction of the United States over all lands acquired under the Act.

While the relators in this case are the parents of minor children residing in a defense housing project in Euclid, there has been no attempt to conceal the fact that this case was initiated by the FPHA or its agent. When the Federal authorities take the position that minor children living in these projects are entitled to be enrolled in the schools of the City of Euclid without the payment of tuition or any other sum for their education, their position is very different from and inconsistent with that of the framers of the Lanham Act as shown by the Report of the Committee considering the bill submitted to Congress on November 28, 1941.

The Committee, in its report, said:

"The great body of American workmen now engaged in the national defense effort do not desire rent subsidy" and also, "the committee repeat that this act is not designed as a slum clearance measure."

On page 5 of the report the Committee added this most interesting paragraph:

"The present law permits the Administrator to enter into agreements to pay sums in lieu of taxes on properties developed under this legislation. More mature reflection on the part of the committee has brought the conviction that houses constructed by the Government to meet the purposes of this legislation should bear the burden of local taxation in common with all other residences in the community. The payment of annual sums in lieu of taxes should be mandatory; and the amount of them should approximate the taxes which would be paid if the property were not exempt from taxation, with appropriate allowance for capital expenditures made by the government for streets and other utilities to serve the houses in question. If the houses built under the authority of this legislation are to be absorbed into the local community and the residents are to receive the usual public services provided by the state, county or city, whichever it may be, these services must be paid for. They should be paid for, as all such services are paid for, by the residents of the houses; otherwise, an undue and insupportable burden might be placed upon the states, counties or cities where the houses are built."

The administrator of the Lanham Act has construed the provision as to the payment "of annual sums in lieu of taxes" to mean that the only thing mandatory about it is that the auditor and public officials of Cuyahoga County must accept

the property valuation on these projects fixed by the administrator, on the penalty that otherwise local governments shall receive nothing for services which they must then render without compensation. That thereby, as stated in the report of the Congressional Committee "an undue and insupportable burden might be placed on the states, counties or cities where the houses are built" seems to have been lost sight of by the federal authorities in this case.

The Lanham Act is plainly defective in that it fails to state what authority is to determine the amount which would "approximate the taxes which would be paid if the property were not exempt from taxation." In the absence of such a designation in the Act it is a natural inference that the same public official who fixes the valuations of all other properties in this county for purposes of taxation, should also determine the valuation of lands and buildings in defense housing projects.

The administrator of the act has not seen fit to adopt this construction, but on the contrary he has proceeded to make his own valuations (which would pay less than ten percent of the cost of education per pupil) and to insist that they be accepted by local officials. As to this attitude on the part of the Federal Administrator we have one comment to make. It does seem a little presumptuous that an administrator sitting at his desk in Washington who may never have been in Cuyahoga County should think that he knows more about the valuation of lands in Cuyahoga County than does the public official charged with the duty of making such valuations in all other cases.

Up to this point, we have considered the issues in this case as questions of law only. The court, however, should not be and is not unmindful of what may well be the practical effect of a contrary decision in this case. Counsel in the case stated that twenty percent of all the housing in the City of Euclid is now located in these defense housing projects. The number of these projects may increase so that fifty percent or even a greater percentage of the whole residential property of the City of Euclid may be included in them.

If the children residing in these projects are entitled to schooling without the payment of any tuition or any payment by FPHA, the burden that may be cast on the shoulders of the taxpayers of the City of Euclid may become so "undue and insupportable" as to seriously lower, if not destroy, the effectiveness of its public school system.

The defendants in this case have added to their answer a cross-petition in which they request that this court make a

judicial declaration and determine whether a proper construction of Sec. 306 of the Lanham Act requires the payment by FPHA of sums "approximating taxes" as determined from the valuation fixed by the auditor of Cuyahoga County on his duplicate.

The plaintiff filed a motion to strike this cross-petition from the files, which we grant. This court is without jurisdiction to determine the answer to the question propounded in the cross-petition.

For the reasons stated, a decree should be entered for the defendants.

SKEEL, J., conurcs.